Dennis M. Cusack (State Bar No. 124988)
Katina Ancar (State Bar No. 207950)
Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

Attorneys for Plaintiff
CENTILLIUM COMMUNICATIONS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CENTILLIUM COMMUNICATIONS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>ATLANTIC MUTUAL INSURANCE COMPANY,<br><br>Defendant. | Case No. 4:06-cv-07824-SBA<br><br>**CENTILLIUM COMMUNICATION, INC.'S MOTION; NOTICE OF MOTION; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: October 2, 2007<br>Time: 1:00 p.m.<br>Place: Courtroom 3, 3rd Floor<br>Judge: Hon. Saundra Armstrong |

TABLE OF CONTENTS

Page

I. INTRODUCTION ........ 1
II. STATEMENT OF MATERIAL UNDISPUTED FACTS ........ 1
A. The Underlying Accton Suit ........ 1
B. Centillium Is Insured Under a Policy Issued By Atlantic Mutual ........ 3
1. Accton Alleged Damages Potentially Within the Errors and Omissions Coverage ........ 4
2. Accton Alleged Damages Potentially Within The CGL Coverage ........ 6
C. Atlantic's Refusal to Defend or Respond to the Accton Suit ........ 8
III. APPLICABLE LEGAL STANDARD ........ 8
A. Legal Standard Governing Summary Judgment ........ 8
B. The Duty To Defend Under The Insurance Policy ........ 9
IV. ATLANTIC OWED A DUTY TO DEFEND UNDER THE TECH E&O COVERAGE OF THE 2005-06 POLICY ........ 10
A. The Suit Alleges Potentially Covered Errors or Omissions ........ 10
B. The Product Recall Exclusion Does Not Necessarily Bar Coverage ........ 11
C. The Intentional and Dishonest Acts Exclusions Do Preclude the Potential for Covered Damages ........ 13
V. ACCTON OWED A DUTY TO DEFEND UNDER THE CGL COVERAGE IN THE 2002-04 POLICY ........ 13
A. The Complaint and Facts Outside the Complaint Alleged Covered Property Damage ........ 13
B. The Impaired Property Exclusions Do Not Preclude the Potential for Coverage ........ 15
C. The "Your Product" and "Your Work" Exclusions Do Not Apply ........ 15
D. The "Expected Or Intended" Exclusion Does Not Bar Coverage ........ 16
E. The Product Recall Exclusion Does Not Apply ........ 16
VI. CONCLUSION ........ 16

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........ 8, 9

*Anthem Electronics, Inc. v. Pacific Employers Insurance Co.*, 302 F.3d 1049 (2002) ........ 14, 16

*Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831 ........ 8

*Becton Dickinson and Co. v. C.R. Bard, Inc.*, 922 F.2d 792 (Fed. Cir. 1990) ........ 8, 9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986.) ........ 8

*Homestead Insurance Co. v. Ryness Co.*, 851 F. Supp. 1441 (N.D. Cal. 1992) ........ 10

*Imperial Casualty and Indemnity Co. v. High Concrete Structures*, 858 F.2d 128 (3d Cir. 1988) ........ 12, 16

*Parker Hannifin Corp. v. Steadfast Insurance Co.*, 445 F. Supp. 2d 827 (N.D. Ohio 2006) ........ 12, 13

**STATE CASES**

*Amato v. Mercury Casualty Co.*, 18 Cal. App. 4th 1784 (1993) ........ 9

*Armstrong World Industrial, Inc. v. Aetna Casualty & Surety Co.*, 45 Cal. App. 4th 1 (1996) ........ 12

*Atlantic Mutual Insurance Co. v. Hillside Bottling Co.*, 387 N.J. Super. 224, 903 A.2d 513 (2006) ........ 12

*Burke Concrete Accessories, Inc. v. Tolson*, 27 Cal. App. 3d 237 (1972) ........ 13

*Buss v. Superior Court*, 16 Cal. 4th 35 (1997.) ........ 9

*Gray v. Zurich Insurance Co.*, 65 Cal. 2d 263 (1966) ........ 10

*Horace Mann Insurance Co. v. Barbara B.*, 4 Cal. 4th 1076 (1993.) ........ 9, 13

*Montrose Chemical Corp. v. Superior Court*, 6 Cal. 4th 287 (1993.) ........ 9, 13, 14, 16

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

*Mullen v. Glens Falls Insurance Co.*,
73 Cal. App. 3d 163 (1977)........................................................................................ 9

*Vandenberg v. Superior Court*,
21 Cal. 4th 815 (1999.) ............................................................................................ 9

*Waller v. Truck Insurance Exch., Inc.*,
11 Cal. 4th 1 (1995) .............................................................................................. 10

**FEDERAL STATUTES**

Fed. R. Civ. P. 56(c).......................................................................................................... 8

## MOTION AND NOTICE OF MOTION

TO: DEFENDANT ATLANTIC MUTUAL INSURANCE COMPANY AND ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that on October 2, 2007, at 1:00 p.m. or as soon thereafter as counsel may be heard by the above-entitled Court, located at 1301 Clay Street, Oakland, California 94612, in Courtroom 3, 3rd Floor, plaintiff Centillium Communications, Inc. will and hereby does move the Court pursuant to Federal Rule of Civil Procedure 56(d) for an order granting plaintiff partial summary judgment on the issue of whether Atlantic Mutual breached its duty to defend Centillium in the Accton suit.

This motion is made on the grounds that, as to this issue, there are no material facts in dispute and the Court may decide the issue as a matter of law. This motion is based upon this Motion and Notice of Motion, the Memorandum of Points and Authorities filed herewith, and the supporting Declaration of Dennis M. Cusack, the pleadings and papers on file herein, and on such other and further matters as may be presented to the Court at the time of the hearing.

DATED: July 13, 2007

FARELLA BRAUN & MARTEL LLP

By: /s/
Katina Ancar

Attorneys for Plaintiff
CENTILLIUM COMMUNICATIONS, INC.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiff Centillium Communications, Inc. ("Centillium") requests that this Court grant partial summary judgment in its favor on the issue of whether Atlantic Mutual Insurance Company ("Atlantic") breached its duty to defend Centillium against a state court lawsuit brought by Accton Technology Corporation ("Accton"). On its face, Accton's lawsuit alleges damages potentially covered under Atlantic's technology errors and omissions and general liability insurance policies, triggering the duty to defend in each. Despite receiving prompt notice of the claim from Centillium, Atlantic refused even to respond to Centillium's request for a defense. After more than ten months of ignoring Centillium's attempts to spur Atlantic to meets its policy obligations, Atlantic issued a formal refusal to defend on baseless grounds. To narrow the scope of the action pending before the Court, Centillium requests an order granting partial summary judgment on this issue.

## II. STATEMENT OF MATERIAL UNDISPUTED FACTS

### A. The Underlying Accton Suit

Centillium develops electronic semiconductor chips, software and other products designed to provide, among other things, high-speed internet access. In 2002, one of its customers was Accton. (Declaration of Dennis M. Cusack ("Cusack Decl."), Ex. A ¶ 6.) Accton produced modems for wireless internet access. From December 2002 to early 2003, Centillium sold certain of its electronic semiconductor chips (the "P200 chip") to Accton. Accton then incorporated these chips into its modems and sold the modems to its own customers. (Cusack Decl., Ex. A ¶¶ 5-6, 9.)

On December 8, 2005, Accton filed a complaint against Centillium in the Superior Court of the State of California for the County of Alameda, Action No. CV RG05245726 (the "Accton suit"), alleging that Centillium manufactured and sold certain electronic semiconductor chips to Accton that were defective and failed to meet the expected performance specifications. (Cusack Decl., Ex. A.) Accton also specifically alleged that Centillium's chip caused damage to other components of Accton's wireless modems. (Cusack Decl., Ex. A ¶ 40: "As a proximate result of

the P200 chip defect, the P200 chips damaged other component parts and the HR-10 routers.") .) Accton alleged that modems incorporating the chips failed as a result. (Cusack Decl., Ex. A ¶ 9.)

Among other damages, Accton claimed that it spent over four million dollars in retrieving and repairing modems that had failed due to Centillium's chips. (Cusack Decl., Ex. A at ¶¶ 11-12.) According to Accton, several months after purchasing the chips, Accton notified Centillium that some of the modems would "hang up" or disconnect suddenly. (Cusack Decl., Ex. A at ¶¶ 8-9.) Accton alleged that the failures and damage occurred at some point after November 2002 when it took delivery of the Centillium chips. (Cusack Decl., Ex. A at ¶¶ 8-9.)

During fact discovery in the lawsuit, Accton gave further details of the alleged damage to other components of the modems. As to the failed modems that customers sent back, Accton initiated a "rework" of the modems. These repairs involved not only the exchange of the Centillium chip, but also the removal and replacement of every affected capacitor, another modem component manufactured by a company called Gloria. (Cusack Decl., Ex. O at 135:4-14.) Centillium neither manufactured the capacitors nor incorporated them into the Accton modem. (Declaration of Daniel M. Jochnowitz (Jochnowitz Decl.") ¶ 3). Accton witnesses testified that during operation the Centillium chip would "lock-up." (Cusack Decl., Ex. M at 74:10-23.) In addition, a "pop up" occurred on the surface of the nearby capacitor. (Cusack Decl., Ex. M at 72:12-:25; 73:3-4.) The "pop up" phenomenon was a visible deformity to the capacitor. (Cusack Decl., Ex. M at 72:19-25; 73:3-4.) A browning of the "L13 choke line" or "inductor," another non-Centillium component of the Accton modem that assisted in regulating voltage, also occurred. (Cusack Decl., Ex. M at 75:1-10; (Jochnowitz Decl. ¶ 3.) Accton alleged that the chip would seize and its temperature would rise. (Cusack Decl., Ex. N at 298:1-6.) This temperature increase in turn overheated and damaged the nearby capacitor and the L13 wire. (Cusack Decl., Ex. M at 75:4-10; Ex. N, 297:12-298:8, 298:10-11.)

In addition to replacement costs, Accton contended that reworking returned modems included expenses for transporting, sorting, warehousing and treating the returned modems. (Cusack Decl., Ex. L at 3:15-17, 4:12-18].)

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

Accton alleged in its complaint that it issued a "public recall notice." It further alleged, however, that its damages were for "recalling, reworking and/or replacing the *failed* HR-10 routers." (Cusack Decl., Ex. A ¶ 11)(emphasis added). Discovery confirmed that Accton neither authorized nor called for customers to return every Accton modem containing a Centillium chip. (Cusack Decl., Ex. P at 292:25 – 294:14.) Instead, it advised customers "that they could return their [modems only] … if they were experiencing internet connectivity problems." (Cusack Decl., Ex. L at 5:28 – 6:3; 6:23-25.) In response to interrogatories requesting a description of the return or repair of *functioning* modems, Accton's verified responses confirmed that there were "[n]one." (Cusack Decl., Ex. L at 7:8-20.)

Accton also maintained that it discussed the problem with Centillium in January 2003. (Cusack Decl., Ex. A ¶ 8.) Without requiring proof that the chip was in fact at fault for Accton's modem failures, Centillium resolved the issue at that time by providing Accton with additional chips at no cost. (Jochnowitz Decl. ¶ 4.) Accton remained a Centillium customer through the year 2004, but never again complained to Centillium about the affected chip. *Id.* ¶ 5. Accton neither sent a demand letter to Centillium nor requested a return of any portion of the purchase price. As a result, Centillium considered the matter resolved. *Id.* ¶ 5. The lawsuit was Centillium's first sign of Accton's apparent dissatisfaction and its first written demand for money. *Id.* ¶ 6. Centillium informed Atlantic of these facts in its initial tender letter. (Cusack Decl., Ex. B.)

### B. <u>Centillium Is Insured Under a Policy Issued By Atlantic Mutual</u>

Atlantic issued a policy providing technology errors and omissions, primary commercial general liability, and umbrella general liability insurance to Centillium for the period beginning May 7, 2002 to May 7, 2004 (policy number 761-00-66-75-0000). The policy was renewed for the periods May 7, 2004 to May 7, 2005 (policy number 711-00-54-58-0000) and May 7, 2005 to May 7, 2006 (policy number 711-00-54-58-0001) (collectively the "Policy"). (Exhibit A to Docket No. 1.) The Policy's coverages for errors and omissions and for general liability both

provide a duty to defend Centillium against any suit seeking potentially covered damages. (Cusack Decl., Exs. C, D.)[1]

1. **Accton Alleged Damages Potentially Within the Errors and Omissions Coverage**

The errors and omissions (or Tech E&O) insuring agreement of the 2005-06 Policy undertakes both a duty to defend and to provide coverage for damages because of "errors or omissions" as long as the claim is first made during the Policy period:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "errors or omissions" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.

(Cusack Decl., Ex. C at 1.) Under the policy language, "errors or omissions"

> means any act of negligence or error or omission by or on behalf of the insured resulting in the failure of 'your electronic products' to perform the function or serve the purpose intended.

(Cusack Decl., Ex. C at 6.) The Policy defines "your electronic products" as "electronic goods, programs, designs, products, services, or components which you or others trading under your name manufactured sold, handled, or distributed." (Cusack Decl., Ex. C at 6.)

In order for an "error or omission" involving the insured's "electronic product" to be covered under the Policy, the error or omission must give rise to a "claim" during the policy period. (Cusack Decl., Ex. C at 1.) "Claim" is defined as "any written demand for money, judgment or arbitration award which the insured becomes legally obligated to pay, resulting from an actual or alleged 'error or omission.'" (Cusack Decl., Ex. C at 5.) Accton's first written demand for money was the December 2005 lawsuit. (Jochnowitz Decl. ¶ 6.)

The Atlantic Tech E&O policy includes several potential coverage exclusions. One such exclusion is the Policy's "product recall" exclusion, which bars coverage for

> Any loss, cost, or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

[1] For the Court's convenience, Centillium attaches as separate exhibits the pertinent pages of the Policy.

(1) "your electronic product";

(2) Any property on which "your service" was performed; or

(3) impaired property, meaning tangible property other than "your electronic products" or "your work", that cannot be used or is less useful because:

(a) It incorporates "your electronic products" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

(b) You have failed to fulfill the terms of a contract or agreement;

If such property can be restored to use by:

(a) The repair, replacement, adjustment or removal of "your electronic products" or "your work"; or

(b) Your fulfilling the terms of the contract or agreement;

If such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy, or dangerous condition in it.

(Cusack Decl., Ex. C at 2). As discussed below, this exclusion applies only if an entire product line is recalled from the market whether or not the goods are damaged. In this case, Accton withdrew only defective modems. (Cusack Decl., Ex. A ¶ 11, Ex. P at 293:14 – 294:17.)

Atlantic's Policy also incorporates "Intentional Acts" and "Dishonest Acts" exclusions. (Cusack Decl., Ex. C at 1-2.) The intentional acts exclusion prevents coverage for

> Loss caused intentionally by or at the direction of any insured when done with the consent or knowledge of the Named Insured or any of the Named Insured's directors, partners, or executive officers.

(Cusack Decl., Ex. C at 1.) The dishonest acts exclusion states that the Policy does not apply to

> Loss arising from acts, errors omissions of any insured when done with the consent or knowledge of the Named Insured or any of the Named Insured's directors, partners or "executive officers" which are dishonest, fraudulent, criminal or malicious. This exclusion applies whether the insured was acting alone or in collusion with others.

(Cusack Decl., Ex. C at 2.) As the application of both exclusions depends upon an ultimate finding of intent in the litigation, neither can defeat the potential for coverage.

2. **Accton Alleged Damages Potentially Within The CGL Coverage**

Centillium also tendered the Accton suit to Atlantic for defense under the 2002-2004 Policy's commercial general liability, or CGL, section which provides coverage for, among other things, "property damage" that happens during the Policy period and is caused by an "occurrence." (Cusack Decl., Ex. D at 1.) "Property damage" is defined as:

- Physical injury to tangible property, including all resulting loss of use of that property; or
- Loss of use of tangible property that is not physically injured.

(Cusack Decl., Ex. D at 13.) "Occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Cusack Decl., Ex. D at 12.)

The CGL insuring agreement includes a "right and duty to defend" virtually identical to that in the Tech E&O coverage. (Cusack Decl., Ex. D at 1.)

The CGL coverage contains several exclusions potentially applicable to property damage claims. The "Impaired Property Exclusion" bars coverage for

> "Property damage" to "impaired property" or property that has not been physically injured, arising out of
>
> (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work" . . .

(Cusack Decl., Ex. D at 4.) "Impaired property" is defined as

> tangible property, other than "your product" or "your work", that cannot be used or is less useful because:
>
> a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
> b. You have failed to fulfill the terms of the contract or agreement;
>
> if such property can be restored to use by:
> a. The repair, replacement, adjustment or removal of "your product" or "your work"; or
> b. Your fulfilling the terms of the contract or agreement. (Cusack Decl., Ex. D at 11.)

"Your product" means

> a. any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by
> (1) You;

(2) Others trading under your name, or
(3) A person or organization whose business or assets you have acquired; and

b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance of "your product"; and

b. The providing of or failure to provide warnings or instructions. (Cusack Decl., Ex. D at 13-14.)

The Policy defines "Your work" as

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance of "your product"; and

b. The providing of or failure to provide warnings or instructions. (Cusack Decl., Ex. D at 14.)

The Accton suit alleges physical injury to the capacitor and the L13 inductor wire, components made by a company other than Centillium. (Cusack Decl., Ex. M at 75:4-7; Ex. N at 297:12-298:8, 298:10-11.) Consequently, as explained below, this exclusion is inapplicable.

Atlantic has also cited the "Recall Of Products" exclusion. The recall exclusion extends to

> Damages claims for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment or removal of
>
> (1) "Your product";
>
> (2) "Your work"; or
>
> (3) "Impaired property";
>
> if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

(Cusack Decl., Ex. D at 4.) Again, this exclusion applies to the entire withdrawal of a product even if not actually defective.

In addition, the "Expected Or Intended Injury" exclusion bars coverage for "'property damage' expected or intended from the standpoint of the insured … ." (Cusack Decl., Ex. D at 1.) However, because the litigation might result in a finding of no intent, the provision does not apply to bar defense of the Accton suit.

**C. Atlantic's Refusal to Defend or Respond to the Accton Suit**

On January 4, 2006, Centillium tendered the Accton suit to Atlantic for defense and indemnity. (Cusack Decl., Ex. B.) Atlantic failed to respond for over ten months, despite Centillium's repeated requests that Atlantic accept the defense of the Accton suit. (Cusack Decl., Exs. E-I.) Centillium's requests included additional evidence from discovery confirming the potential for covered damage. (Cusack Decl., Ex. I.) Centillium's suggestion that Atlantic attend an October 2, 2006 court-ordered mediation of the Accton suit met with similar silence. (Cusack Decl., Exs. G, H.) In the meantime, Centillium was forced to hire defense counsel to defend the suit at significant cost to itself. (Jochnowitz Decl., ¶ 7.)

Atlantic finally denied coverage formally in a letter dated November 9, 2006, over ten months after it learned of the Accton suit. (Cusack Decl., Ex. K.) Atlantic's letter denied coverage only under the May 7, 2002 to May 7, 2004 Policy periods, and failed to take into account any of the supplemental information that Centillium provided. (Cusack Decl., Ex. K at 6.)

## III. APPLICABLE LEGAL STANDARD

**A. Legal Standard Governing Summary Judgment**

Summary judgment is appropriate when the evidence adduced shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986.) A material fact is one whose finding is necessary to the proceedings, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and is viewed in light of the legal standard to be applied in the case. *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984.) In other words, the substantive law dictates what constitutes a material fact. *Becton Dickinson and Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 796 (Fed. Cir. 1990); *see also Anderson*, 477

U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Partial summary judgment is authorized by Fed. R. Civ. Proc. 56(c) and (d), *Becton*, 922 F.2d at 796, and is appropriate where a "dispute" is not genuine and the evidence does not demonstrate "that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**B. <u>The Duty To Defend Under The Insurance Policy</u>**

In a lawsuit between an insurer and its insured over the insurer's duty to defend, it is well-settled that the insurer carries a much more onerous burden on summary judgment than the insured. While the insured must merely demonstrate that the claims asserted against it give rise to *any potential* for coverage in order to trigger the duty to defend, the insurer must show with undisputed facts the *absence* of any such potential. *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 300 (1993.)

The duty to defend arises when the facts alleged in the complaint, or available outside the complaint, raise any potential for damages covered by the policy. *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076, 1081 (1993.) The duty to defend depends on the facts alleged, not how the complaint labels the causes of action. *Vandenberg v. Superior Court*, 21 Cal.4th 815, 840 (1999.) The insurer must also consider facts available to it *outside* the complaint ("extrinsic evidence") when determining its duty to defend. *Montrose*, 6 Cal. 4th at 298-299. Evidence that the insured provides to its carrier must be taken as true. *Amato v. Mercury Cas. Co.*, 18 Cal.App.4th 1784, 1792 (1993); *Mullen v. Glens Falls Ins. Co.*, 73 Cal.App.3d 163, 170 (1977) (holding insurer liable for breach of defense duty because it possessed information when it denied defense that showed potential for coverage).

The duty to defend is broader than the duty to indemnify, and attaches even if the claims are ultimately found to be baseless or not covered. *Horace Mann*, 4 Cal.4th at 1081. If any of the claims alleged in the complaint raise potentially covered damages, the insurer *must* defend the entire case. *Buss v. Superior Court*, 16 Cal.4th 35, 48-49 (1997.) "Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor." *Horace Mann*, 4 Cal.4th at

1081. Accordingly, the duty to defend is determined by comparing the allegations of the complaint and the facts available to the insurer with the terms of the policy. *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 265 (1966), and is generally a legal determination amenable to resolution on summary judgment. *Homestead Ins. Co. v. Ryness Co.*, 851 F. Supp. 1441, 1443 (N.D. Cal. 1992); *see also Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995).

## IV. ATLANTIC OWED A DUTY TO DEFEND UNDER THE TECH E&O COVERAGE OF THE 2005-06 POLICY

### A. The Suit Alleges Potentially Covered Errors or Omissions

As defined by the Policy an "error or omission" is

> any act of negligence or error or omission by or on behalf of the insured resulting in the failure of "your electronic products" to perform the function or serve the purpose intended.

(Cusack Decl., Ex. C at 6.) Accton alleges it suffered damages caused by Centillium's electronic product: certain chips that Centillium manufactured and sold to Accton. According to Accton, Centillium's product failed to perform properly and thus was "unfit for the ordinary purpose for which such chips are used." (Cusack Decl., Ex. A ¶ 21.A.) Consequently, the complaint alleges a potentially covered "error or omission."

Nonetheless, Atlantic denied coverage under the May 7, 2002 to May 7, 2004 Policy periods. (Cusack Decl., Ex. K at 1.) Atlantic's internal claims documents demonstrate that Atlantic apparently assumed – without evidence – that Accton made its claim against Centillium in either 2002 or 2003, and thus that the claim was reported to Atlantic too late. (Cusack Decl., Ex. J.) Atlantic was not only mistaken, it ignored information provided by Centillium in the initial tender letter establishing that the "claim" was first made when the lawsuit was filed in December 2005.

The Tech E&O Policy is a "claims-made" policy. The Policy defines a "claim" as "any *written demand for money*, judgment or arbitration award which the insured becomes legally obligated to pay, resulting from an actual or alleged 'error or omission.'" (Cusack Decl., Ex. C at 5) (emphasis added). Accton never made a written demand for money until it filed its lawsuit.

With this written monetary demand in hand, Centillium tendered the claim to Atlantic less than one month later. (Cusack Decl., Ex. B.) Thus, Centillium tendered the claim under the Tech E&O coverage in effect at that time: the May 7, 2005 – May 7, 2006 Policy. Consequently, Accton's complaint raises the potential for coverage under the Policy.

**B. <u>The Product Recall Exclusion Does Not Necessarily Bar Coverage</u>**

Atlantic contends that the Policy's product recall, or "sistership,"[2] exclusion excuses its obligations under the Tech E&O coverage. Both the Accton complaint and the additional evidence adduced in discovery demonstrate that this exclusion does not defeat Atlantic's duty to defend.

The exclusion by its terms only applies if "the product . . . is withdrawn or recalled from the market or from use . . . ." The California Court of Appeal in *Armstrong World Indus., Inc. v. Aetna Cas. and Surety Co.*, 45 Cal. App. 4th 1 (1996), a case involving a dispute over insurance coverage for asbestos litigation, illustrates the inapplicability of the recall exclusion to circumstances in which, as with the Centillium chip, a product causes *actual physical damage*. Instead, the exclusion is directed at withdrawal from the market as a preventative measure without any evidence of actual defect.

In *Armstrong*, the insurer argued that the product recall exclusion barred coverage for the costs of removing asbestos from buildings. The insurer argued that the asbestos had not yet caused *actual damage*, and was merely a prospective health risk; therefore the company's actions were analogous to a product recall. *Id.* at 113. The court rejected this argument, holding that the mere presence of asbestos fibers in the building constituted property damage, and observed that

> the sistership exclusion operates to exclude coverage for the cost of preventative or curative action when the insured withdraws a product in situations in which a danger is merely apprehended. It does not, however, operate to exclude coverage for actual damage caused by the very product giving rise to such an apprehension.

---

[2] The exclusion takes its name from an airline industry practice, upon discovering that an airplane had crashed because of a design defect, of grounding all other airplanes, or "sister ships," of the same model. *Armstrong World Indus., Inc. v. Aetna Cas. & Surety Co.*, 45 Cal. App. 4th 1, 113 (1996).

*Id.* (internal cites and quotations omitted.) Because the court had already determined that the presence of asbestos constituted property damage, the insured's restorative efforts were not "preventative or curative action." Instead, these actions represented measures to repair *actual damage* caused by its product. *Id.*

Although Accton alleged that it issued a "public recall notice," it also alleged that it only incurred costs for the return and repair of *failed* modems. (Cusack Decl., Ex. A ¶ 11.) Additional discovery confirmed that Accton made no general appeal for the return of all Accton modems containing the Centillium chip. To the contrary, Accton issued a notice advising end-users to return the modem for warranty repair *only if they experienced internet connectivity problems*. (Cusack Decl., Ex. P, at 294:8-14; Ex. L at 5:28-6:3.)

Other courts have uniformly confirmed that the exclusion is relevant only to those preventative product withdrawals without confirmation of actual defect. *See, e.g., also Imperial Cas. and Indem. Co. v. High Concrete Structures*, 858 F.2d 128, 136-37 (3d Cir. 1988) (sistership exclusion only applies to products withdrawn because of suspected defects and does not apply to withdrawal of allegedly defective products); *Parker Hannifin Corp. v. Steadfast Ins. Co.*, 445 F.Supp.2d 827, 834 (N.D. Ohio 2006) (provision excludes only withdrawal for "preventative or curative action"); *Atlantic Mut. Ins. Co. v. Hillside Bottling Co.*, 387 N.J. Super 224, 903 A.2d 513, 522-23 (2006) (sistership exclusion applicable when manufacturer recalls all of its products rather than merely those with apparent defect).

Accton did not withdraw all of its modems from the market as a preventative measure, regardless of actual damage. Rather, Accton's announcement solicited the return of only those modems that were apparently not working. (Cusack Decl., Ex. L at 6:23-25.) Accton never intended, nor did it issue a notice for, the return of *every* modem regardless of whether the particular consumer was experiencing difficulties. (Cusack Decl., Ex. P at 294:8-14.)

Furthermore, the recall exclusion only excludes coverage for the costs related to removing or replacing "your electronic product" – the Centillium chip itself – and only if the modem could be "restored to use by . . . the . . . replacement . . . of 'your electronic products.'" The Accton suit, however, alleges damages based on costs of removing and replacing *other damaged modem*

*components*. (Cusack Decl., Ex. A ¶ 40.) When a customer returned a modem, Accton initiated a "rework" or repair, replacing not only the Centillium chip, but also every damaged capacitor – a non-Centillium component. (Cusack Decl., Ex. O at 135:4-14; Ex. L at 3:15-17, 4:12-18.) The costs related to the capacitor are separate and apart from the replacement or repair of the Centillium chip. Such damages are not excluded by the product recall exclusion. *Burke Concrete Accessories, Inc. v. Tolson*, 27 Cal.App.3d 237, 242 (1972) (cost of filling and resurfacing holes left by removal of defective plugs with concrete not "replacement" costs.) *Parker Hannifin Corp. v. Steadfast Ins. Co.*, 445 F.Supp.2d 827, 834 (N.D. Ohio 2006) (costs associated with retrofitting defective television components not excluded damages).

### C. The Intentional and Dishonest Acts Exclusions Do Preclude the Potential for Covered Damages

The Policy's Intentional and Dishonest Acts Exclusions do not preclude a duty to defend Accton's allegations. Ultimately, any finding of liability in the Accton suit may be based on conduct evidencing no intent to harm or dishonesty. Where the possibility of liability based on nonintentional conduct (or no liability at all) exists, these exclusions do not relieve Atlantic of its duty to defend. *See, e.g.*, *Montrose*, 6 Cal. 4th at 304 (carrier owes duty to defend where allegations of intentional conduct in dispute); *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1086 (1993.) Because both scenarios are potential results in this lawsuit, neither exclusion bars Atlantic's duty to defend Accton's allegations.

## V. ACCTON OWED A DUTY TO DEFEND UNDER THE CGL COVERAGE IN THE 2002-04 POLICY

### A. The Complaint and Facts Outside the Complaint Alleged Covered Property Damage

The Accton complaint asserts that the Centillium chips used as a component in Accton's modems were defective. (Cusack Decl., Ex. A at ¶¶ 11, 17.) Accton further alleged that "the chips damaged other component parts and the HR-10 routers." (Cusack Decl., Ex. A at ¶ 40.)

These allegations alone raise the potential for covered "property damage" under the Policy, defined as: "Physical damage to tangible property, including all resulting loss of use of that property." (Cusack Decl., Ex. D at 13.) Mr. Lin's testimony elaborated on the Accton

complaint's allegations of damage to the modem's component parts. The consequences of the alleged chip lock-up included physical damage to the capacitor and the corresponding L13 line. These facts, although external to the complaint, reinforce the existence of the potential for covered "property damage" under the Policy. *Montrose*, 6 Cal.4th at 295-96 (extrinsic evidence of coverage necessitates that insurer defend.)

In addition, even if discovery might have shown that Accton's modems stopped functioning, without physical damage to other components, the allegations still potentially fall within the second section of the Policy's "property damage" definition: "Loss of use of tangible property that is not physically injured." Atlantic therefore owed a duty to defend under the CGL portion of the Policy, and breached that duty.

The Ninth Circuit determined that the type of damage that Accton alleges raises a potential for covered property damage. *Anthem Electronics, Inc. v. Pacific Employers Ins. Co.*, 302 F.3d 1049 (2002). *Anthem* involved a policyholder who manufactured electronic circuit boards. When incorporated into scanners and exposed to certain conditions, the allegedly defective circuit boards caused the scanners to stop working. *Id.* at 1052. As a result, the insured faced claims including breach of contract, negligence, breach of implied warranty of merchantability, and negligent misrepresentation.

Like Atlantic, the insurer refused to defend *Anthem*, asserting that there was no potential for covered property damage and no "occurrence." *Id.* The Court agreed with Anthem that the alleged scanner failures could result in a finding of property damage, defined either as physical injury to tangible property *or* loss of use of tangible property that has not been physically injured. The Court also rejected the argument (also made by Atlantic here) that any property damage did not result from an "occurrence," defined as an "accident." The Court concluded that, as long as the actual malfunction was an unintended consequence of the product's initial manufacture and sale, the resulting property damage would be an "occurrence." As a result, Anthem was entitled to a defense of the claims. *Id.* at 1056.

Centillium faces identical allegations that its chips, when integrated into Accton's modems, caused the products to fail and damaged other components. Under *Anthem*, Atlantic owed a duty to defend.

**B. The Impaired Property Exclusions Do Not Preclude the Potential for Coverage**

Atlantic first asserts that the Policy's "impaired property exclusion" exonerates it from providing a defense of the suit. The Policy's impaired property exclusion bars coverage for injury to "impaired property, or property which has not been physically injured." (Cusack Decl., Ex. D at 4.) "Impaired property" is defined as

> tangible property, other than "your product" or "your work", *that cannot be used or is less useful* because:
>
> a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
> b. You have failed to fulfill the terms of the contract or agreement;
>
> *if such property can be restored to use by:*
>
> *a. The repair, replacement, adjustment or removal of "your product" or "your work*"; or
> b. Your fulfilling the terms of the contract or agreement. (emphasis added).

Thus, the exclusion applies where the alleged "property damage" was solely for "loss of use of tangible property which has not been physically injured." Accton, however, alleges that the Centillium chip caused physical damage to other constituent parts of the Accton modem. (Cusack Decl., Ex. A ¶ 40.) In deposition, Accton's former director of product engineering further described how the modem could not be restored to use by replacing only the Centillium chip, but also required replacement of the damaged capacitor and L13 wire. The "impaired property" exclusion does not apply at all to these allegations.

**C. The "Your Product" and "Your Work" Exclusions Do Not Apply**

Moreover, Centillium manufactured neither the capacitor nor the L13 wire. Accton independently incorporated these component parts into its modem without Centillium's participation. (Jochnowitz Decl. ¶ 3.) As a result, neither of these products falls within the

Policy's exclusions for damage to "your product" or "your work." Rather, the Policy specifically offers coverage for damage to parts such as the modem capacitor and L13 wire that are the property of others.

### D. The "Expected Or Intended" Exclusion Does Not Bar Coverage

Atlantic's further suggestion that the alleged failure of Centillium's chips was "expected," and thus excluded from coverage, is unavailing. A determination of Centillium's intent depends on the ultimate determination of the disputed facts of the Accton suit. Despite Accton's allegations, the possibility remained that the alleged failures would be found to be "without intent or through carelessness." *Anthem*, 302 F.3d at 1056. Atlantic may not employ the very factual uncertainties that *establish* the potential for coverage to defeat its duty to defend. *Id.* at 1060; *Montrose*, 6 Cal. 4th at 299-300 (any factual doubts resolved in favor of the duty to defend.)

### E. The Product Recall Exclusion Does Not Apply

Atlantic again resorts to the product recall exclusion in the CGL coverage. The language of the exclusions under both Policies is nearly identical. Thus, just as with the Tech E&O coverage, the CGL product recall exclusion does not apply to the return and repair of actually defective and damaged products. *See, e.g., Imperial Cas. and Indem. Co. v. High Concrete Structures*, 858 F.2d 128, 136-37 (3d Cir. 1988) (sistership exclusion only applies to products withdrawn because of suspected defects.) Therefore, the exclusion has no impact on the potential for coverage that requires Atlantic to defend of the lawsuit.

## VI. CONCLUSION

As to these issues, there is no dispute of material facts. Atlantic owed Centillium a duty to defend the Accton suit. Accordingly, Centillium requests that the Court grant its motion for partial summary judgment.

DATED: July 13, 2007

FARELLA BRAUN & MARTEL LLP

By: /s/
Katina Ancar

Attorneys for Plaintiff
CENTILLIUM COMMUNICATIONS, INC.