**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| CENTILLIUM COMMUNICATIONS, INC., | No. C 06-7824 SBA |
| Plaintiff, | **ORDER** |
| v. | [Docket Nos. 27, 30] |
| ATLANTIC MUTUAL INSURANCE CO., | |
| Defendant. | |

Before the Court is plaintiff Centillium Communications, Inc.'s (Centillium) Motion for Partial Summary Judgment [Docket No. 27], and request for additional discovery pursuant to Federal Rule of Civil Procedure 56(f). Also before the Court is defendant Atlantic Mutual Insurance Co.'s (Atlantic Mutual) Motion for Summary Judgment/Alternative Motion for Partial Summary Judgment [Docket No. 30]. After reading and considering the arguments presented by the parties, the Court finds these matters appropriate for resolution without a hearing. *See* FED. R. CIV. P. 78. For the reasons that follow, the Court grants Centillium's motion with respect to the 2002-2004 Policy and denies Atlantic Mutual's motion with respect to the same. The Court declines granting summary judgment in favor of either party with respect to the 2005-2006 Policy due to the parties' stipulation to the filing of an amended complaint.[1] The Court also finds that the Rule 56(f) request is now moot in light of the parties' stipulation to the filing of an amended complaint and stipulation to continue the discovery deadlines. Finally, the Court denies Atlantic Mutual's motion for summary judgment on Centillium's claim that it breached the covenant of good faith and fair dealing.

---

[1] Since the submission of the parties' motions for summary judgment, the parties have stipulated to the filing of an amended complaint that adds a second defendant. *See* Docket No. 49. The amendment to the complaint relates to Centillium's claims of coverage under the 2005-2006 Policy. The amended complaint does not change the claims or factual assertions related to the 2002-2004 Policy. Thus, as will be discussed below, the amend complaint impacts the present motions with respect to the later policy, it does not affect the analysis of the 2002-2004 Policy.

**BACKGROUND**

This is an insurance coverage action brought by Centillium Communications, Inc. against Atlantic Mutual Insurance Company. The dispute over coverage arises from a lawsuit filed against Centillium in December 2005 by its former customer, Accton Technology Corporation (Accton). Centillium is a developer of electronic semiconductor chips designed to provide high-speed internet access. Accton, a Taiwanese corporation, is in the business of producing computer products, including modems for wireless internet access. From December 2002 to early 2003, Centillium sold semiconductor chips called the "Palladia P200 ASIC" (the Chipset) to Accton. Accton installed the Chipset into one of its computer products, the HR-10 wireless router (the Router). Accton then sold the Routers, through Hitachi, to SHARP Corporation of Japan. SHARP, in turn, sold the Routers to Nippon Telegraph and Telephone (NTT).

In January 2003, Accton learned from SHARP that the Routers were not functioning properly---they would disconnect from the internet after about 20 minutes of use. On January 21, 2003, Accton notified Centillium of the problem. Thereafter, Centillium informed Accton and SHARP that it was aware of a problem with some Chipsets (Chipsets with a certain 'date code'), that the clock specifications were inaccurate, and that a customer using the Chipset in a certain capacity would suffer a 5% failure rate. A 5% failure rate is considered an "epidemic" problem in the industry. Accton witnesses later testified that, during operation, the Chipset would "lock up" and its temperature would rise. They further testified that this temperature increase overheated and damaged other component parts of the Router---the "Gloria capacitor" and the "L13 wire" or "L13 choke line." Accton asserted that another router model (H-15) contained a Gloria capacitor and did not contain the Centillium Chipset. Leach Decl., Ex. C, 21. The H-15 routers did not fail.

On or around January 15, 2004, Accton's customers issued a public recall notice to end users who purchased the Routers. Leach Decl., Ex. C, at 4 (Accton's Response to Centillium's Supplemental Interrogatories). The notice advised the end user that they could return the Router "if they were experiencing internet connectivity problems." *Id.* at 6. When a Router was returned, a determination

of whether the Chipset was potentially defective was made by checking the date code. *Id.* If it had a "bad" date code, it was shipped back to Accton to be screened. *Id.* at 4-5. The screening involved placing the Routers in a thermal oven to simulate normal temperature running conditions. *Id.* at 5. If the units failed, they would be "reworked." *Id.* The "reworking" process included the removal and replacement of the Chipset and the Gloria capacitor. *Id.* at 5; Cusack Ex. O. SHARP and Hitachi demanded that Accton pay their respective costs of recalling, reworking, and/or replacing the failed Routers. Accton also had to test the Routers in inventory and the unassembled Chipsets. Accton alleged that it incurred over $4,500,000 in costs in retrieving and repairing the failed Routers.

On December 8, 2005, Accton filed a complaint against Centillium in the Superior Court of the State of California for the County of Alameda. Accton stated causes of action for: (1) Breach of Contract; (2) Breach of Implied Warranty of Merchantability; (3) Breach of Implied Warranty of Fitness for a Particular Purpose; (4) Breach of Express Warranty; (5) Strict Products Liability; (6) Fraud and Concealment; (7) Negligent Misrepresentation; and (8) Declaratory Relief for Indemnity. Each cause of action alleged that Centillium represented that the Chipsets had certain timing properties, Accton relied on those representations in designing the Routers, and the Chipsets did not perform to Centillium's stated specifications.

On January 4, 2006, Centillium tendered the Accton suit to Atlantic Mutual, through OneBeacon Insurance, for defense and indemnity under two separate policies. First, Centillium sought coverage under the general commercial liability provisions of a 2002-2004 Policy (2002-04 Policy) issued by Atlantic Mutual. Second, Centillium sought coverage under the "act, error, or omission" provisions of a 2005-2006 Policy (2005-06 Policy) issued by Atlantic Speciality Insurance Company (Atlantic Specialty). Atlantic Mutual owned Atlantic Specialty until early 2004. Atlantic Mutual Motion for Summary Judgment (Atlantic Mutual MSJ), 6, n.7. At that time, OneBeacon Insurance purchased Atlantic Specialty and, in so doing, purchased the right to all policy renewals from Atlantic Mutual. *Id.* Accordingly, when Centillium renewed its prior policy, it purchased coverage from OneBeacon, through its newly-acquired subsidiary, Atlantic Specialty. *Id.*

From January 2006 to October 2006, Centillium attempted to contact Atlantic Mutual several times to obtain a determination of whether Atlantic Mutual would accept or deny the claim for defense and indemnity. Cusack Dec., Exs. E-I. In October 2006, Centillium provided Atlantic Mutual with additional facts regarding the Chipset failure and its impact on the Router. Cusack Dec., Ex. I. Atlantic Mutual formally denied coverage on November 14, 2006, over ten months after the suit was tendered.

On December 21, 2006, Centillium filed a complaint against Atlantic Mutual claiming breach of contract for its failure to accept its duty to defend. Centillium also claims that Atlantic Mutual breached the implied covenant of good faith and fair dealing because it denied coverage pursuant to a policy to avoid its defense and indemnity obligations. Atlantic Mutual did not disclaim responsibility for the 2005-06 Policy in its answer to Centillium's complaint. Centillium Opp'n., 6. Instead, it stated that it had not had the "opportunity to determine the accuracy or authenticity" of the policy. *Id.* On August 14, 2007, one month after Centillium filed its Motion for Summary Judgment and over a year and a half since Centillium first tendered the suit, Atlantic Mutual first disclosed that Atlantic Specialty was no longer its subsidiary. Centillium's Reply to Atlantic Mutual's MSJ (Centillium Reply), 1.

## LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The party moving for summary judgment must demonstrate that there are no genuine issues of material fact. *See Horphag v. Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). An issue is "material" if its resolution could affect the outcome of the action. *Anderson*, 477 U.S. at 248; *Rivera*, 395 F.3d at 1146.

In responding to a properly supported summary judgment motion, the non-movant cannot merely

4

rely on the pleadings, but must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986); *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002); *Federal Trade Comm'n v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001). In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004); *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir. 2004).

**B.     Insurer's Duty to Defend**

Insurance companies must defend insureds for actions that give rise to a potential for indemnity. *Kazi v. State Farm Fire & Cas. Co.*, 24 Cal. 4th 871, 879 (2001). The duty to defend arises whenever the third party complaint and/or the available extrinsic facts suggest the possibility of covered claims. *Scottsdale Ins. Co. v. M.V. Transp.*, 36 Cal. 4th 643, 657 (2005). Thus, an insurer's duty to defend can be excused only when "the underlying complaint 'can by no conceivable theory raise a single issue which could bring it within the policy coverage.'" *Lakeside Non-Ferrous Metals, Inc. v. Hanover Ins. Co.*, 172 F.3d 702, 704 (9th Cir. 1999) (citing *Montrose Chem Corp. v. Superior Court*, 6 Cal. 4th 287, 300 (1993)). The duty to defend must be assessed at the outset of litigation against an insured, *Staefa Control-System Inc. v. St. Paul Fire & Marine Ins. Co.*, 847 F. Supp. 1460, 1466 (N.D. Cal. 1994), "from the facts and inferences known to an insurer from the pleadings, available information and its own investigations at the time of the tender of defense." *CNA Cas. of Cal. v. Seaboard Sur. Co.*, 176 Cal. App. 3d 598, 610 (Cal. Ct. App. 1986).

The interpretation of an insurance policy is generally a legal determination. *See Homestead Ins. Co. v. Ryness Co.*, 851 F. Supp. 1441, 1443 (N.D. Cal. 1992). Accordingly, a determination of an insurer's duty to defend may properly be resolved on summary judgment if there are no material issues of fact. *See id.* Courts determine whether an insurer has a duty to defend its insured by comparing the allegations of the third party complaint with the terms of the policy. *Kazi*, 24 Cal. 4th at 879. To prevail

5

1  on a motion for summary judgment, the insured need only show that the underlying claim may fall
2  within the policy coverage; the insurer must prove that it cannot. *Montrose*, 6 Cal. 4th at 300
3  (discussing standard on cross-motions for summary judgment ). Any ambiguous policy terms and any
4  doubt as to whether the facts establish the duty are resolved in the insureds' favor. *Kazi,* 24 Cal. 4th at
5  879 (citing *Montrose*, 6 Cal. 4th at 299). Facts merely tending to show that the claim is not covered,
6  or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the
7  nature of the action) will fall within the scope of coverage, therefore add no weight to the scales. *Id.*
8  When the possibility of coverage exists and the insured tenders defense of the action, the insurer
9  must assume it. *Scottsdale Ins. Co.*, 36 Cal. 4th at 657. "The duty to defend then continues until the
10 third party litigation ends, unless the insurer sooner proves . . . that the potential for coverage which
11 previously appeared cannot possibly materialize, or no longer exists." *Id.* "The insurer must absorb all
12 costs it expended on behalf of its insured while the duty to defend was in effect—i.e., before the insurer
13 established that the duty had *ended.*" *Id.* (emphasis in original).

## DISCUSSION

The parties have filed cross-motions for summary judgment, both of which address the same issue---Atlantic Mutual's duty to defend Centillium in the underlying action. Atlantic Mutual has moved for summary judgment that it had no duty to defend Centillium; Centillium has moved for summary judgment that Atlantic Mutual had such a duty. Atlantic Mutual also seeks summary judgment on the issue of whether it breached the covenant of good faith and fair dealing.

**A.   Duty to Defend Under the 2002-04 Policy**

Centillium claims coverage for property damage caused by the Chipsets under the general liability provisions policy number 761-00-66-75-0000. Atlantic Mutual's Motion for Summary Judgment (Atlantic MSJ), 7. This policy was issued by Atlantic Mutual and was in effect from May 7, 2002 to May 7, 2004. *Id.* The terms of the policy require Atlantic Mutual to pay those sums that

6

Centillium becomes obligated to pay as damages because of "property damage" caused by an "occurrence" during the policy period. Centillium's Motion for Summary Judgment (Centillium MSJ), 6; Cusack Decl., Ex. D, 1 (2002-04 Policy). "Property damage" is defined as either "physical injury to tangible property, including all resulting loss of use of that property," or "loss of use of tangible property that is not injured." Cusack Decl., Ex. D, 1. Centillium seeks a defense of a suit under the first of these two, alleging "physical injury to tangible property." Centillium Reply to Atlantic Mutual MSJ (Centillium Reply), 6. The latter definition of "loss of use" is inapplicable here.

California courts have repeatedly recognized that "[s]trictly economic losses like lost profits, loss of goodwill, loss of the anticipated benefit of a bargain, and loss of an investment, do not constitute damage or injury to tangible property covered by a comprehensive general liability policy." *Waller v. Truck Ins. Exch.,* 11 Cal. 4th 1, 17 (1995). "A complaint seeking to recover damages of this nature falls within the scope of the insurance coverage only where these intangible economic losses provide 'a measure of damages to physical property which is within the policy's coverage.'" *Id.* (citing *Giddings v. Industrial Indem. Co.,* 112 Cal. App. 3d 213, 217 (1980)).

### 1.  Centillium's Burden - Potential for Coverage

The duty to defend "may exist even where coverage is in doubt and ultimately does not develop." *Montrose*, 6 Cal. 4th at 295. Thus, the salient issue here is not whether Accton's claim against Centillium is actually covered by the policy. Instead, Centillium must show that Accton's complaint could reasonably be construed as seeking recovery for property damage as defined in the 2002-04 Policy. It has done so.

There are at least two theories under which the allegations in the Accton complaint could possibly give rise to claims covered by the "physical injury to tangible property" definition of "property damage" in the 2002-04 Policy. First, in its sixth cause of action (for strict product liability), Accton alleged that the Chipset damaged "other component parts and the H-10 routers." Accton Compl., 9 [Docket No. 34, Exhibit A]. Thus, the complaint, on its face, alleges that the Chipset defect caused "physical injury to tangible property" within the meaning of the 2002-04 Policy's terms, placing the suit

squarely within Atlantic Mutual's duty to defend.

In its opposition, Atlantic Mutual points out that in March 2006, Centillium successfully demurred this cause of action. In the state action Centillium argued that Accton had not alleged sufficient damages to state a products liability claim because it sought to recover for only economic losses. The California Superior Court found that the complaint did not "clearly or sufficiently allege that it was seeking to recover for the damages to such property as opposed to the economic loss of remedying defects in the components manufactured by [Centillium]." Atlantic Opp'n., 11. The court granted the demurrer with leave to amend. *Id.* Atlantic Mutual argues that Centillium's successful demurrer eliminated the allegation from the complaint and, thus, excused it of any duty to defend based on "property damage." Atlantic Mutual's Opp'n. to Centillium MSJ (Atlantic Opp'n.), 11.

This argument misses the mark. The relevant inquiry in a "duty to defend" analysis is whether, at the outset of the litigation, based on the complaint and any extrinsic evidence, there existed any possibility of coverage. The complaint alleges physical damage to tangible property---the non-Centillium components of the Routers. Even if it does not meet the applicable pleading requirements, the complaint can still be reasonably construed as seeking damages covered by the 2002-04 Policy; and it could have amended to so allege. *See Montrose*, 6 Cal. 4th at 299 ("the insured is entitled to a defense . . . if the complaint might be amended to give rise to a liability that would be covered under the policy"). Moreover, the court did not grant the demurrer until approximately three months after Centillium tendered the suit to Atlantic Mutual for defense. Since the duty to defend must be assessed at the outset of litigation against an insured, Atlantic Mutual's argument fails. *See Staefa Control-System*, 847 F. Supp. at 1466.

The second theory upon which the Accton suit gives rise to the possibility of coverage is Accton's allegation that it paid $2,300,000 to SHARP and Hitachi for their costs in "recalling, reworking and/or replacing the failed H-10 routers." Accton Compl., 4 [Docket No. 34, Ex. A]. The complaint does not specifically allege that "reworking" the Routers required the repair or replacement of non-Centillium components. However, since Accton alleges that it had to cover its customers' costs

8

in "reworking and/or replacing" the *Routers*---not only the Chipset---the complaint can be reasonably construed as seeking damages for injury to non-Centillium components of the Routers.

Thus, Centillium has demonstrated that the Accton complaint encompassed claims which would potentially warrant coverage under the policy. It also cited the appropriate law showing that Atlantic Mutual had a duty to defend in the Accton suit. Accordingly, Centillium has met its initial burden to demonstrate a duty to defend.

**2.     Atlantic Mutual's Burden - No Possibility of Coverage**

Under California law, summary judgment for Centillium is required unless Atlantic Mutual is able to conclusively negate coverage as a matter of law. *Anthem Elecs., Inc. v. Pacific Employers Ins. Co.*, 302 F.3d 1049, 1466 (9th Cir. 2002). Thus, to prevail, Atlantic Mutual must demonstrate that the Accton complaint could "by no conceivable theory raise a single issue which could bring it within the policy coverage." *Montrose*, 6 Cal. 4th at 300. Atlantic Mutual attempts to meet its burden by arguing that the underlying suit does not allege "property damage" and, alternatively, by arguing that the Accton suit falls within a number of coverage exclusions.

**a.     "Property Damage"**

Atlantic Mutual urges the Court to find that there was no possibility of coverage because "nowhere does the complaint seek damages for property damage to other router components" because it does not specifically mention the Gloria capacitor or the L13 choke line. Atlantic MSJ, 4-5. However, the fact that the complaint does not specifically identify the other components is insufficient to eliminate the possibility that alleged damages will fall within the scope of coverage. As discussed above, the term "reworking" is broad enough to encompass damages related the repair of non-Centillium components and Accton's sixth cause of action specifically alleges physical injury to other components of the Router.

Additionally, Atlantic Mutual contends that Accton did not seek to recover for "property damage" because Accton's legal consultant, Jack Weaver, deducted the costs attributable to repairing the Gloria capacitor from Accton's damages calculation. *Id.* at 5. However, Atlantic Mutual cites a

9

deposition in which Mr. Weaver testified that he deducted only the costs of replacing the Gloria capacitor in Router models that did not have Chipsets with bad date codes. Leach Decl., Ex. E, 47 (20% of routers returned in the recall did not have bad date codes, they were shipped to Japan instead of Accton, and the capacitor was replaced without being tested for failure). Since this still leaves open the possibility that Accton sought damages for the replacement of Gloria capacitors in Routers that contained Chipsets with bad date codes, this fact does not conclusively establish that Accton's damages could not fall within the scope of coverage. Thus, it "adds no weight to the scales" and it remains possible that the complaint could raise a covered issue. *See Kazi*, 24 Cal. 4th at 879.

Atlantic Mutual next argues that there is no possibility of coverage because the damages alleged----the costs related to reworking and replacing the Routers---cannot fall within the definitions of "property damage" as they have been construed by courts applying California law. Atlantic MSJ, 16. It relies primarily on two cases in support of its position, both of which are inapposite.

First, Atlantic Mutual cites *Amtel Corporation v. St. Paul Fire & Marine Insurance Co.*, 430 F. Supp. 2d 989 (N.D. Cal. 2006). In *Amtel*, the plaintiff in the underlying suit, Seagate, purchased faulty chips from the insured, Amtel, and installed the chips into its product, a disk drive. *Amtel*, 430 F. Supp. 2d at 991. Seagate sought damages from the cost of replacing the defective chips in the disk drives. *Id.* at 992. Amtel attempted to characterize the costs of repairing and replacing the defective chips as "loss of use" damages flowing from Seagate's customers' lost use of disk drives. *Id.* at 994. The court held that Seagate's costs in repairing the drives were not sufficiently connected with any inability to use the drives---that there must be a more direct nexus between the damages claimed and the loss of use, such as the "cost of providing loaner scanners and lost receivables." *Id.* at 994-95. Here, Accton sought damages similar to those that Seagate sought in *Amtel*: the costs associated with recalling and repairing the Routers. However, unlike Seagate, Accton alleged that at least some part of these damages arose from physical injury to the Router caused by the defective Chipset, not merely "loss of use" of the Routers. Accordingly, since *Amtel* construed a separate and distinct definition of the standard CGL "property damage" term, it does not inform the analysis of whether the Accton complaint alleged

damages that could potentially fall within the "physical damage to tangible property" definition.

The second case that Atlantic Mutual cites in effort to narrow the definition of "property damage" and preclude any possibility of coverage is *F&H Construction v. ITT Hartford Insurance Company of the Midwest*, 118 Cal. App. 4th 364 (2004). There, the insured subcontractor installed steel "pile caps" into a building that lacked the load-bearing capacity required by the contractor. *Id.* at 367. The contractor subsequently strengthened the pile caps by welding additional support to them. *Id.* The only damages alleged were the costs of modifying the pile caps and a lost bonus for early completion of the project. *Id.* at 373. The court held that "the incorporation of a defective component or product into a larger structure does not constitute property damage unless and until the defective component causes physical injury to tangible property in at least some other part of the system." *Id.* at 372. Accordingly, the court further held that these damages were "not recoverable as property damage because they are intangible economic damages rather than damages 'to tangible property.'" *Id.* Here, again, Accton's allegations regarding damages are general enough (the costs of "reworking and repairing") that one may reasonably read the complaint as seeking damages flowing from some physical injury caused by the Chipset to other Router components. The present case is distinguishable from *F&H* because the Accton complaint alleges, or can reasonably be read to allege, that the "defective component" caused physical injury to "some other part of the system." Thus, *F&H* does not eliminate all theories under which the Accton complaint could possibly allege coverage under the 2002-04 Policy.

Next are Atlantic Mutual's arguments that the Accton suit falls within a number of coverage exclusions.

### b. The Impaired Property Exclusion

The 2002-04 Policy excludes from coverage "property damage" to "impaired property" *that has not been physically injured*, arising out of a defect in the insured's work. Centillium MSJ, 6; Cusack Decl., Ex. D, 4. "Impaired property" is defined, in part, as tangible property, other than the insured's product, that cannot be used or is less useful because of a defect in the insured's product if it can be restored to use by the repair or replacement of the insured's product. Centillium MSJ, 6; Cusack Decl.,

11

Ex. D, 11.

Atlantic Mutual asserts that the Routers are "impaired property" because "the Router is tangible property that has been made less useful . . . because it incorporates Centillium's defective product . . . and [was] restored to use by replacement of the Chipset." Atlantic MSJ, 19. It further asserts that the exclusion applies, thereby eliminating any possibility of coverage, because "Accton alleged only economic loss resulting from injury to the product itself." *Id.* However, as discussed above, the Accton complaint alleged that the Chipset physically injured other components of the Routers. Atlantic Mutual has not adduced any additional evidence conclusively establishing that, at the time the suit was tendered, Accton did not allege such a physical injury. Thus, Atlantic Mutual has not met its burden.

### c.     The "Your Product" Exclusion (Exclusion (k))

The 2002-04 Policy excludes coverage for "'property damage' to '[the insured's] product' arising out of it or any part of it.'" Atlantic MSJ, 17; MSJ, 6; Cusack Decl., Ex. D, 4. This exclusion is inapplicable because the Accton complaint alleged damage to non-Centillium Router components---not merely damage to the Chipset---and it is possible that Accton sought damages for costs related to replacing those components. Accordingly, it does not excuse Atlantic Mutual's duty to defend.

### d.     The "Product Recall" Exclusion

The 2002-04 Policy excludes coverage for "[d]amages claimed for any loss, cost or expense incurred by you or others for the . . . recall . . . [of "your product" or "impaired property"] if such product, work, or property is withdrawn or recalled . . . because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it." Cusack Decl., Ex. D, 4. The "product recall" or "sistership" exclusion "operates to exclude coverage for the cost of 'preventative or curative action' when the insured withdraws a product in situations in which a danger is merely apprehended." *Armstrong World Indus. v. Aetna Cas. & Sur. Co.*, 45 Cal. App. 4th 1, 113 (Cal. Ct. App. 1996). "It does not, however, operate to exclude coverage for actual damage caused by the very product giving rise to such an apprehension." *Id.* (emphasis added).

Atlantic Mutual argues that this exclusion applies because the Router recall was a "public notice

recall" which permitted an end user to return a Router even if they did not experience any problems. Atlantic MSJ, 19. In support of this contention, Atlantic Mutual cites the deposition testimony of Accton's Executive Vice President, Fai-Long Kuo. Mr. Kuo was asked whether it was a true statement that "the recall was for actual failures as the customer was advised to return HR-10 routers which experienced internet connectivity problems." Leach Decl., Ex. A, 232. Mr. Kuo responded, "[h]ere, it also says there was a public recall notice. So long as there's a public notice, whether your unit has a -- a problem or not, you can return it." *Id.* at 232-33.

In response, Centillium points to evidence that the recall was not merely 'preventative' and only asked end users to return Routers that were experiencing problems---those in which the Chipset had likely failed. Specifically, in Accton's responses to Centillium's interrogatories, it explicitly stated that the end user could return the Router "if they were experiencing internet connectivity problems." Leach Decl., Ex. C, 4. Additionally, an Accton representative testified that he "[didn't] believe that people in general would send a working machine back because people don't tend to do that, and that's not what was authorized." Cusack Decl., Ex. P, 294. Instead, he testified, "[the end users] were authorized to send back machines that weren't working" and "the intent was if you're having a problem, send it back." *Id.*

For its part, the Accton complaint states only that a "public recall notice" was issued, without defining that term. As demonstrated above, what Accton intended by issuing a "public recall notice" is ambiguous because there is conflicting testimony from Accton regarding its intent. In determining whether an insurer had a duty to defend, any ambiguity regarding whether facts establish the duty to defend are to be resolved in favor of the insured. *Kazi*, 24 Cal. 4th at 879 (citing *Montrose*, 6 Cal. 4th at 299). Since it is unclear from the term "public notice recall" whether Accton intended to recall only the Routers that were actually damaged by the Chipset, it remained possible that Accton did not issue the recall as a mere 'preventative measure.' In such a case, the "public recall" exception would not apply. Moreover, the Kuo testimony, in light of Accton's other statements regarding the recall, is not the "undisputed extrinsic evidence conclusively eliminating the potential for coverage under the policy"

13

required to prevail on the "duty to defend" issue. *See Maryland Cas. Co. v. National Am. Ins. Co.*, 48 Cal. App. 4th 1822, 1832 (1996).

Since Centillium met its burden of showing that the complaint raises issues that could possibly be covered by the 2002-04 Policy, and Atlantic Mutual failed to conclusively negate that possibility, the Court denies Atlantic Mutual's Motion for Summary Judgment and grants Centillium's Motion for Summary Judgment with respect to Atlantic Mutual's breach of the duty to defend under the 2002-04 Policy.

### C.      Duty to Defend Under the 2005-06 Policy

Centillium also sought coverage from Atlantic Mutual under a technology errors and omissions policy issued by Atlantic Specialty Insurance Company (Atlantic Specialty) for the period beginning May 7, 2005 and ending May 7, 2006 (policy number 711-00-54-58-0001).

Atlantic Mutual denies any duty to defend or indemnify under this policy because, it asserts, it did not issue the policy. Atlantic MSJ, 6. Specifically, Atlantic Mutual contends that it sold its subsidiary, Atlantic Specialty, to OneBeacon in 2004 and, in the transaction, OneBeacon purchased all rights to renewal policies. Thus, it argues, when Centillium renewed its policy in 2005, it purchased coverage from OneBeacon, through its newly-acquired subsidiary, Atlantic Specialty. *Id.* Atlantic Mutual urges the Court to grant summary judgment in its favor regarding the 2005-06 Policy because Centillium has named the wrong defendant. Atlantic MSJ, 12.

Centillium maintains that it did not know that Atlantic Specialty was no longer an Atlantic Mutual subsidiary---that it thought OneBeacon purchased *both* companies. Centillium asserts that this belief was reasonable because: (1) it interacted with Atlantic Mutual and OneBeacon for over two years following the tender of the suit and neither disclosed to Centillium that they were separate entities; (2) after tendering the suit to OneBeacon, OneBeacon delivered the complaint directly to Atlantic Mutual's claims agent; (3) neither OneBeacon nor Atlantic Mutual disclosed that OneBeacon/Atlantic Specialty was solely accountable for the errors and omissions policy; and (4) a OneBeacon representative, Ms.

14

Dickert, was able to direct Centillium to the Atlantic Mutual claims adjuster, thus leading Centillium to believe that Atlantic Mutual was a OneBeacon subsidiary. Centillium Opposition, 19.

Centillium has withdrawn its motion for summary judgment regarding the 2005-06 policy. Centillium Reply, 1. Instead, Centillium requests that the Court continue the hearing and allow it extra time to conduct discovery on this issue under Federal Rule of Civil Procedure Rule 56(f). *Id.*

Rule 56(f) "provides a mechanism whereby a party opposing a motion for summary judgment may, by affidavit, state valid reasons why he is temporarily unable to present 'facts essential to justify the party's opposition' to such motion." *Weinberg v. Whatcom County*, 241 F.3d 746, 751 (9th Cir. 2001). "If the court grants the party's 56(f) request, the court may (1) refuse to grant summary judgment; (2) order a continuance to permit affidavits to be taken or discovery to be had; or (3) make such other order as is just." *Id.* Rule 56(f) thus protects parties from a premature grant of summary judgment. *Id.* "Ordinarily, summary judgment should not be granted when there are relevant facts remaining to be discovered." *Continental Maritime of San Francisco, Inc. v. Pacific Coast Metal Trades Dist. Council*, 817 F.2d 1391, 1395 (9th Cir. 1987). However, the party seeking a continuance bears the burden to show what specific facts it hopes to discover that will raise an issue of material fact. *Id.*

Centillium asserts that it is unable to present facts essential to opposing Atlantic Mutual's denial of responsibility for the 2005-06 Policy because the relationship between Atlantic Specialty /OneBeacon and Atlantic Mutual was disclosed too late to conduct adequate discovery. In support of its Rule 56(f) motion, Centillium submitted the declaration of its counsel, Katina Ancar. Ancar Decl. [Docket No. 43]. Ms. Ancar declares that Atlantic Mutual first disclosed that Atlantic Specialty was no longer its subsidiary on August 14, 2007, one month after Centillium filed its Motion for Summary Judgment and over a year and a half after Centillium first tendered the suit. Ancar Decl. [Docket No. 43]. Additionally, she declares that "[a]s a result of Atlantic Mutual's assertion that OneBeacon/Atlantic Specialty Insurance Company is responsible for errors and omissions policy, Centillium requested information confirming this contention. In response, Centillium received two general press releases

15

noting a sale. The releases did not describe the specific details of the transaction." *Id.* at 2. Moreover, she asserts that "[i]t is also unclear whether the transaction encompassed the lines of insurance business involved in this insurance action. Centillium must also investigate whether Atlantic Mutual retained responsibility for any insurance policy renewals." *Id.* at 3.

Since the time of submission of these motions for summary judgment, the parties have filed a stipulation to allow Centillium to amend its complaint to name Atlantic Specialty as a defendant. *See* Docket No. 49 (filed September 28, 2007). The parties have also stipulated to additional discovery. But for the stipulation of a new complaint, the Court would have been inclined to grant the Rule 56(f) request. Given the parties' stipulation to a new compliant, the Court finds the most prudent course at this time is to deny without prejudice Atlantic Mutual's motion for summary judgment on the 2005-06 Policy.

### D.   Atlantic Mutual's Motion for Summary Judgment on Centillium's Breach of the Covenant of Good Faith and Fair Dealing Claim

Atlantic Mutual urges the Court to find that there can be no action for bad faith because there was no duty or benefits owed under the contract. Atlantic MSJ, 21. Because the Court has found that Atlantic Mutual breached its duty to defendant, the Court denies this portion motion of the defendant's motion for summary judgment.

### CONCLUSION

Accordingly, the Court GRANTS in part, DENIES in part plaintiff Centillium's Motion for Partial Summary Judgment [Docket No. 27]. That portion of the motion seeking summary adjudication related to the 2002-04 Policy is granted.

The Court DENIES defendant Atlantic Mutual's Motion for Summary Judgment/ Alternative Motion for Partial Summary Judgment [Docket No. 30]. That portion of the motion seeking summary adjudication of issues related to the 2002-04 Policy is denied. That portion of the Atlantic Mutual's motion related to the 2005-06 Policy is denied without prejudice in view of the parties' stipulation to

file an amended complaint. Centillium's request for further discovery under Rule 56(f) on the 2005-06 Policy is denied as moot. Finally, the Court denies Atlantic Mutual's motion for summary judgment on Centillium's claim that it breached the covenant of good faith and fair dealing.

Pursuant to the stipulation between the parties, the Court further ORDERS:

1. The plaintiff may file a first amended complaint and shall promptly effect service on Atlantic Specialty Insurance Company;

2. Defendant Atlantic Mutual waives notices and service. Atlantic Mutual shall have twenty days from the date that the first amended complaint is filed with the Court to submit and serve an amended answer. If Atlantic Mutual does not file an amended answer within that time, its prior answer shall be deemed its answer to the first amended complaint.

3. The existing deadlines for all discovery (including expert witness disclosure) is VACATED. New deadlines will be set at the case management conference scheduled for December 6, 2007, at 3:00 P.M., via telephone. The parties shall **meet and confer** prior to the conference and shall prepare a joint Case Management Conference Statement which shall be filed no later than ten days prior to the Case Management Conference that complies with the Standing Order For All Judges Of The Northern District Of California and the Standing Order of this Court. Plaintiff shall be responsible for filing the statement as well as for arranging the conference call. All parties shall be on the line and shall call (510) 637-3559 at the above indicated date and time.

IT IS SO ORDERED.

October 3, 2007

_Saundra B Armstrong_
Saundra Brown Armstrong
United States District Judge

17